UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

ST. CHARLES PARISH HOSPITAL SERVICE          CIVIL ACTION
DIST. NO. 1


VERSUS                                       NO: 07-5924


UNITED FIRE AND CASUALTY CO.                 SECTION: R


**ORDER AND REASONS**

Before the Court are plaintiff's Motion to Enforce Judgment and Confirm Appraisal Award (R. Doc. 49) and defendant's Motion to Vacate Appraisal Award (R. Doc. 68).  For the following reasons, both motions are DENIED.  The Court REMANDS this matter to the appraisal panel to resubmit an appraisal award consistent with this Order.


**I. Background**

This case arises out of an insurance dispute between plaintiff, St. Charles Parish Hospital Service No. 1, and defendant, its insurer.  During Hurricane Katrina, which struck southern Louisiana on August 29, 2005, the Hospital sustained damage to its property in Luling, Louisiana.  This property was insured by a policy issued by defendant, setting a limit of over $15.5 million for property damage to buildings, $5 million for

1

business income and extra expense, and approximately $7.3 million for business personal property. Disagreements between the parties developed during the adjustment and payment process. The Hospital eventually invoked a provision of the insurance policy that becomes available when the parties cannot agree about the amount of a particular loss or the value of property. The appraisal provision concerning business and personal property reads as follows.

2. Appraisal

> If we and you disagree on the value of the property or the amount of the loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and the amount of the loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. . . . If there is an appraisal, we will still retain our right to deny the claim.

R. Doc. 14, Ex. A at 27. Once this provision is applied, each party selects a competent and impartial appraiser who will eventually provide an opinion as to the value of the property and the amount of the loss. Before doing so, the two appraisers select an umpire to make the final decision. If the parties cannot agree on an umpire, they may move the Court to select one. Once a three-person panel is assembled, an appraisal award signed by any two "will be binding" on the parties.

The Hospital selected Lewis O'Leary as its adjuster and defendant eventually chose Jerry Provencher. These two appraisers could not agree on an umpire[1] and asked the Court to select one. Each party submitted four nominees to the Magistrate Judge. After significant briefing and oral argument, the Magistrate Judge evaluated the backgrounds and qualifications of the candidates and selected Ernie Carpenter, one of plaintiff's proposed umpires, as the umpire. R. Doc. 38. Defendant objected to this determination on the grounds that Carpenter was partial and unqualified. This Court overruled these objections, holding that the Magistrate Judge had all of the relevant information before him and reached his decision on a basis that was neither clearly erroneous nor contrary to law. R. Doc. 41.

The appraisal process began. O'Leary submitted his initial report, estimating the loss at approximately $3.4 million. Of this, nearly $1.8 million was for loss of business income. R. Doc. 83, Ex. 1 at 8-9. Provencher submitted a rebuttal report, which estimated that the repairs could be made for approximately $250,000. This estimate included a finding that the Hospital suffered no loss of business income at all. R. Doc. 83, Ex. 2 at

_____

[1] Plaintiff has contended that O'Leary and Fred Combs, defendant's first appraiser, initially agreed on Ernie Carpenter as an umpire, but that defendant instructed Combs to withdraw his agreement. R. Doc. 17, Ex. 2 at 1 (affidavit of Lewis O'Leary). The Magistrate Judge noted that Combs's assent was withdrawn, R. Doc. 38 at 3, and Combs was later replaced by Jerry Provencher.

Tab 7.  The members of the appraisal panel provided further rebuttals to the umpire and conducted further discussions. Eventually Carpenter and O'Leary signed off on an appraisal award that appraised the loss at approximately $4.2 million.  R. Doc. 83, Ex. 6.  Provencher did not sign the award.

The Hospital now moves to confirm the appraisal award, which defendant opposes.  Defendant makes a separate motion to vacate the appraisal award, which the Hospital opposes.  The Court rules as follows.

## II. Discussion

Again, the insurance contract between the two parties contains the following provision in the "Business and Personal Property Coverage Form":

2. Appraisal

If we and you disagree on the value of the property or the amount of the loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers *will state separately the value of the property and the amount of the loss*.  If they fail to agree, they will submit their differences to the umpire.  A decision agreed to by any two will be binding. . . .  If there is an appraisal, we will still retain our right to deny the claim.

R. Doc. 14, Ex. A at 27 (emphasis added).[2]  A highly similar

provision appears in the form titled "Business Income Coverage

Form (And Extra Expense)":

> 1. Appraisal
>
> If we and you disagree on the amount of Net Income and
> operating expense or the amount of loss, either may
> make written demand for an appraisal of the loss.  In
> this event, each party will select a competent and
> impartial appraiser.  The two appraisers will select an
> umpire.  If they cannot agree, either may request that
> selection be made by a judge of a court having
> jurisdiction.  The appraisers will state separately the
> amount of Net Income and operating expense or amount of
> loss.  If they fail to agree, they will submit their
> differences to the umpire.  A decision agreed to by any
> two will be binding. . . .  If there is an appraisal,
> we will still retain our right to deny the claim.

R. Doc. 14, Ex. A at 33.  In both provisions, the contract

explicitly states that a "decision agreed to by any two *will be*

*binding*."

Appraisal clauses such as these are enforceable under

Louisiana law.  *See Newman v. Lexington Ins. Co.*, No. 06-4668,

2007 WL 1063578, at *2 (E.D. La. Apr. 4, 2007); *Fourchon Docks,*

*Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 86-

2267, 1988 WL 32938, at *8 (E.D. La. Apr. 6, 1988); *Sevier v.*

*U.S.F. & G.*, 485 So. 2d 132, 135-36 (La. Ct. App. 1986), *rev'd on*

*other grounds*, 497 So. 2d 1380 (La. 1986); *Girard v. Atlantic*

*Mut. Ins. Co.*, 198 So. 2d 444, 445-47 (La. Ct. App. 1967); *Martin*

---

[2] As the pages of the policy are not numbered, all page
references are to the pagination in the sixty-two-page pdf
document attached to R. Doc. 14 as Exhibit A.

*v. Home Ins. Co.*, 133 So. 773, 776 (La. Ct. App. 1931). They do not, however, deprive a court of jurisdiction over the matter. *Newman*, 2007 WL 1063578, at *2; *Fourchon Docks,* 1988 WL 32938, at *8; *Girard*, 198 So. 2d at 446.

The Louisiana Civil Code sets forth the guiding principles for construing contracts in Louisiana. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007); *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003). "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045 (2008). Such intent is to be derived from the language of the contract itself. If that language is "clear and explicit and lead[s] to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id*. art. 2046. Words "must be given their generally prevailing meaning," and terms of art are interpreted as such only when a technical matter is at stake. *Id*. art. 2047. Furthermore, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Id.* art. 2045 (2008).

To the extent that ambiguous terms appear in an insurance contract, they "are to be construed liberally in favor of a person claiming coverage." *Westerfield v. LaFleur*, 493 So. 2d 600, 602-03 (La. 1986); *see also* La. Civ. Code Ann. art 2056 ("In

case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party."); *Arctic Slope Regional Corp. v. Affiliated FM Ins. Co.*, 564 F.3d 707, 709-10 (5th Cir. 2009) (ambiguities in insurance contracts are "to be construed against the insurer and in favor of coverage") (quoting *Sher v. Lafayette Ins. Co.*, 988 So. 2d 186, 193 (La. 2008)); *see also Herbert v. Webre*, 982 So. 2d 770, 774 (La. 2008).

In addition, appraisal provisions in insurance contracts are strictly construed. *Branch v. Springfield Fire & Marine Ins. Co.*, 4 So. 2d 806, 809 (La. 1941). An appraisal award issued under an insurance policy is binding only if the appraisers "have performed the duties required of them by the policy, which is the law between the contracting parties." *Id.; see also Prien Props., LLC v. Allstate Ins. Co.*, No. 07-845, 2008 WL 1733591, at *2 (W.D. La. Apr. 14, 2008); *Fourchon Docks*, 1988 WL 32938, at *8. Contractually specified appraisal awards are presumed accurate. *See In re Waters*, 93 F.2d 196, 200 (5th Cir. 1937) (surveying cases from numerous jurisdictions to determine that "every reasonable intendment and presumption is in favor of an award of appraisers selected to determine the value of property lost"). Further, as the policy explicitly states that "[a]

decision agreed to by any two *will be binding*," the burden of demonstrating that the award should not be confirmed must fall upon the party challenging it. *See* LA. CIV. CODE. arts. 1983, 2045-46; *cf. Wooley v. Lucksinger*, 14 So. 3d 311, 473 (La. Ct. App. 2008) (burden of proving invalidity of clear choice-of-law provision in contract falls upon party seeking to invalidate it); *Continental Eagle Corp. v. Tanner & Co. Ginning*, 663 So. 2d 204, 206 (La. Ct. App. 1995) (same).

Defendant challenges the appraisal award on a number of different grounds. First, it alleges that plaintiff's appraiser and the umpire were not impartial. Second, it contends that the appraisal award makes determinations as to causation and not simply loss. Third, it argues that the umpire's award improperly included interest in its calculation of loss. Fourth, it asserts that several determinations made in the award were in error. Finally, it claims that the policy required the appraisers to list the value of the property and the amount of loss separately, and that the appraisers did not do so. As a result, it asks the Court to vacate the award. These challenges will be addressed in turn.

## A. Impartiality of O'Leary and Carpenter

As an initial matter, defendant at several points seeks to relitigate the issue of Carpenter's competence and selection.

Which of the parties' eight appointees would be selected as umpire was a matter that was subject to considerable briefing and oral argument over an extended period of time. *See* R. Docs. 5, 10, 14, 17, 22, 25, 29, 32. The Magistrate Judge, after reviewing these materials and hearing argument, selected Carpenter as the umpire, R. Doc. 38, and this decision was affirmed by this Court. R. Doc. 41. The issue of whether Carpenter was properly chosen as the umpire has accordingly been decided and it will not be revisited here.

Defendant also challenges, however, whether Carpenter and O'Leary performed their duties impartially. Courts in Louisiana have entertained challenges to the impartiality of appraisers and umpires during the course of appraisals. All of these decisions indicate that the challenging party must produce evidence "that the appraiser's honesty or integrity is suspect." *Carriage Court Condo. Owners Ass'n, Inc. v. State Farm Fire & Cas. Co.*, No. 07-7715, 2009 WL 1565937, at *3 (E.D. La. May 28, 2009); *see also Dawes v. Continental Ins. Co. of City of New York*, 1 F. Supp. 603, 605-06 (E.D. La. 1932). This evidence must "transcend[] the interest of a prior business relationship." *Prien Props.*, 2008 WL 1733591, at *3.

The evidence that defendant points to that is not mere

speculation concerns the calculation of the final award.[3]  It

argues that Carpenter and O'Leary agreed on numerous

calculations, and that the final award agreed to by the two even

exceeded O'Leary's initial estimate.  It further contends that

Carpenter relied on O'Leary's opinions with respect to a number

of the determinations in the award and that the final numbers

were calculated in person by O'Leary and Carpenter without

Provencher's participation or input.  Defendant points out that

O'Leary explained Provencher's absence from the final meeting

with Carpenter by noting that "[i]n the final deliberations when

one appraiser is the apparent heir to victory, those

conversations go on all the time between an umpire and an

appraiser when they're trying to finalize an award."  O'Leary

Deposition, R. Doc. 83, Ex. 7 at 178.  Defendant contends that

this statement is evidence of O'Leary's partiality.

This evidence does not demonstrate a lack of impartiality on

either O'Leary's or Carpenter's behalf.  Mere agreement between

the two is hardly misconduct; in fact, it is the entire purpose

of the umpire's involvement in the process.  With respect to

Carpenter's reliance on O'Leary's figures, the Court finds no

evidence of partiality.  Carpenter testified that, after

---

[3] Defendant also points to alleged acts of partiality
conducted by O'Leary and Carpenter in several entirely different
cases.  R. Doc. 68 at 12, 15.  Even if true, these have no
bearing on the appraisal award in the case before the Court.

reviewing the submissions of both the appraisers, O'Leary's "numbers just made more sense to me than [Jerry Provencher]'s did." Carpenter Deposition, R. Doc. 83, Ex. 8 at 54. Nothing in the policy language requires the umpire to conduct a *de novo* investigation of the damages, and defendant has pointed to no legal authorities to suggest that an umpire's reliance on one appraiser's figures is evidence of impropriety.

Defendant's other suggestion, that Carpenter's and O'Leary's failure to include Provencher in the discussions finalizing the award is evidence of collusion or impropriety, similarly lacks merit. The depositions of both Carpenter and O'Leary explain at length why Provencher was not included in the final discussions. At this time, Carpenter had already received and read the reports and rebuttals submitted by both appraisers. When asked repeatedly about Provencher's absence from the discussion, O'Leary testified that it was clear that Provencher would not agree to the numbers that he and Carpenter were leaning toward, and that including Provencher in the discussion "would accomplish nothing." O'Leary Deposition, R. Doc. 83, Ex. 7 at 175-80, 191-92.

In addition, Carpenter testified that, in his view, Provencher had ceased participating in the process. He stated that Provencher had missed deadlines, stopped sending emails, and had nothing else to submit for rebuttal. *Id*. at 40, 51-52.

11

"[Provencher] took himself out of the loop, pretty much.  Kept asking him for any more rebuttals, any more input, and he didn't have any."  *Id.* at 52.

Finally, Carpenter gave testimony that, by the time the award was being finalized, Provencher had lost credibility in his eyes and he doubted Provencher's figures.  Carpenter specifically testified that "Jerry had made some mistakes and actually lied to me and to Lewis [O'Leary]" and "actually went the opposite way from what his own engineers recommended and kind of lost some of the credibility with me on that."  Carpenter Deposition, R. Doc. 83, Ex. 8 at 40.

In sum, the deposition testimony provides ample, impartial reasons why Provencher was not included in the final discussions. The testimony establishes that O'Leary and Carpenter excluded Provencher not out of partiality, but because they knew that Provencher would not consent to their numbers and because Provencher had no more materials to submit that would have influenced the outcome.  Carpenter made clear that he came to doubt Provencher's credibility during the course of the appraisal.  O'Leary's "apparent heir to victory" comment, taken in context, clearly refers to Carpenter's loss of faith in Provencher and his reliance on O'Leary.  It is not an admission that the process was tainted by partiality.

The circumstances might be much different if an appraiser

and umpire actually excluded the other appraiser from any discussions, or if an umpire declined to review one of the appraisers' materials altogether. This is not the situation here. Carpenter provided testimony that he reviewed all the materials that Provencher submitted and encouraged him to submit further rebuttal evidence. Carpenter Deposition, R. Doc. 83, Ex. 8 at 48-52; *see also* R. Doc. 83, Ex. 9 (itemized bill for Carpenter's service stating that he "[r]ead all materials provided by Appraiser O'Leary and Provencher").

An appraisal is an informal process that does not involve the procedural requirements of a court proceeding. When the parties conduct an appraisal, "[n]o formal trial is contemplated. It is not a common law arbitration. No judge is to instruct [the appraisers]. The whole purpose of the appraisal is to escape the delay and cost and technicality of court procedure." *Penn. Lumbermens Mut. Fire Ins. Co. Of Philadelphia, PA v. Barfield*, 138 F.3d 365, 366 (5th Cir. 1943) (internal citations omitted); *see also Hartford Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058, 1061-62 (5th Cir. 1990). Defendant has pointed to nothing to indicate that substantive *ex parte* discussions between one appraiser and the umpire, without more and particularly after the umpire reviews both sides' materials, are evidence of impartiality. The contractual language contains no prohibition on such conduct, nor does it contain specific guidelines as to

how the appraisers and umpire are supposed to conduct the appraisal. Furthermore, once both appraisers have an opportunity to participate in the appraisal process, the eventual absence of one appraiser is not grounds to invalidate the award. *See, e.g., Farber v. Am. Nat'l Prop. & Cas. Co.*, 999 So. 2d 328, 333-34 (La. Ct. App. 2008) (holding that an appraisal award was properly homologated even though one of the appraisers refused to participate). The Court therefore cannot say that Carpenter's and O'Leary's failure to include Provencher in the final discussions is evidence of partiality or improper motives in the execution of their contractual duties. *See Prien Props.*, 2008 WL 1733591, at *4. In making this holding, the Court expresses no view as to whether the appraisal was conducted in accordance with best practices.

*B. Determinations of Causation in the Award*

Next, defendant challenges the award on the grounds that the appraisers made improper causation determinations. It points to the appraisal award, which states that the appraisers "have conscientiously preformed [sic] the duties assigned to [them] in accordance with the appraisal provisions of the policy and do hereby award the amounts established below as the actual cash value of the damages *as the result of Wind* on 08.29.05." R. Doc. 83, Ex. 6 (emphasis added). Defendant further contends that

O'Leary testified that he made improper determinations of causation in his appraisal.

Although this is the rule in other states, *see, e.g., Munn v. Nat'l Fire Ins. Co. of Hartford*, 115 So. 2d 54, 58 (Miss. 1959) (holding that what caused the damage "was not a question for the appraisers to decide"), defendant has cited no Louisiana authority standing for the proposition that appraisers may not make causation determinations.  In fact, in *Fourchon Docks, Inc. v. National Union Fire Insurance Company*, the district court determined that "the appraisers and the umpire fulfilled their duty under the policy," even though "the appraisers unanimously concluded that damages caused to the reverse osmosis water treatment plant *due to high water* totalled [sic] $18,940.00." 1988 WL 32938, at *2, 5 (emphasis added; punctuation removed).

Even if it would be improper for appraisers to make determinations as to causation under Louisiana law, the extent to which the appraisers here made such determinations would not render the award a nullity.  First of all, the plain language of the policy states that "[i]f there is an appraisal, [defendant] will still retain [its] right to deny the claim."  Any decisions of causation contained in the award may still be challenged, and neither defendant nor the Court is bound by them.

Additionally, the plain language of the policy requires the appraisers to determine the "amount of the loss."  O'Leary

testified that an appraiser needs to take causation into account to a certain extent in order to determine what the term "amount of the loss" refers to. He stated that both he and Provencher "understood that's the mechanics of how an ordinary appraisal is done." *Id.* at 78. His testimony makes clear that an appraiser's job is not to determine policy coverage or liability, but that causation must be considered in order to determine the scope of the loss that must be measured. *Id.* at 69-81. Again, his determinations of causation are not binding, and defendant retains the right to challenge them. In light of the presumption of correctness afforded to appraisal awards, *see In re Waters*, 93 F.2d at 200, and the absence of Louisiana authorities to the contrary, the Court finds that the extent to which O'Leary considered causation in his appraisal does not by itself warrant vacating the award.

*C. Inclusion of Interest in the Award*

Defendant next challenges the award on the grounds that the appraisers improperly included interest in their determinations of loss. There is no dispute as to whether the appraisal award includes interest as an element of loss. *See, e.g.,* O'Leary Deposition, R. Doc. 83, Ex. 7 at 184-186 (O'Leary's statement that interest was included in the award because it is "[p]art of the loss" that the appraisers are "empowered with the authority

to calculate"); Carpenter Deposition, R. Doc. 83, Ex. 8 at 67-69.

(Carpenter's statement confirming that he "signed off on a award
which included interest" and that he was "not sure" whether doing
so was proper, but that he relied on O'Leary's experience).

Neither party provides relevant legal authorities with regard to
the issue, and the opinions of the appraisers are inconclusive.

Provencher states that he has never participated in an appraisal
that included interest as part of the award.  Provencher
Declaration, R. Doc. 83, Ex. 16.  O'Leary, on the other hand,
testified that it is "not uncommon" to include interest in the
award.  O'Leary Deposition, R. Doc. 83, Ex. 7 at 185.

The experience of other states is similarly mixed.  Two
different courts applying Michigan law have come to opposite
conclusions on the issue.  *Compare Acme Roll Forming Co. v. Home
Ins. Co.*, 110 F. Supp. 2d 567, 569-70 (E.D. Mich. 2000)
(reasoning that, under Michigan law, appraisal is a form of
common-law arbitration and arbitrators are empowered to award
interest), *rev'd on other grounds*, 31 Fed. App'x 866, 868 n.1
(6th Cir. 2002), *with R.D. Mgmt. Corp. v. Philadelphia Indem.
Ins. Co.*, 302 F. Supp. 728, 735-36 (E.D. Mich. 2004) (finding
that the policy defined "loss" as "accidental loss or damage" and
thus did not suggest that "that the term includes the lost use of
funds").  Inclusion of interest in an appraisal award is proper
in Minnesota.  *See David A. Brooks Enters., Inc. v. First Sys.*

17

*Agencies*, 370 N.W.2d 434, 436 (Minn. Ct. App. 1985) ("Here, both parties' arbitrators included interest in the appraisal, dating from the occurrence of the damage, and the umpire also calculated this interest.  In light of the strong preference in Minnesota for upholding the finality of an arbitrator's award, we do not find the interest award to constitute bad faith or a failure to exercise an honest judgment.").  The same is true in Rhode Island.  *See Waradzin v. Aetna Cas. & Sur. Co.*, 570 A.2d 649, 650-51 (R.I. 1990) (finding that an appraisal proceeding constituted an arbitration and holding that "[i]n the absence of a specific limitation by the parties on interest, we find that the terms of the policy in this case do not prohibit the awarding of prejudgment interest").  In Arizona, when an appraisal panel is authorized to "appraise the loss, stating separately actual cash value and loss to each item," it is not authorized to determine interest.  *See Hanson v. Commercial Union Ins. Co.*, 723 P.2d 101, 104 (Ariz. Ct. App. 1986).  One decision under Delaware law invalidated a portion of an appraisal award that predicated the inclusion of interest on whether "interest is customarily paid due to the length of time between the actual loss and the date of final payment of an award," although it did so because the award was "too ambiguous in its present form" and did not address the propriety of awarding interest in the first instance. *N.E. Fin. Corp. v. Ins. Co. of N. Am.*, 757 F. Supp. 381, 387-88

(D. Del. 1991).  There thus appears to be no obvious majority
rule among the states to guide this dispute.

Many of the decisions that allow an appraisal panel to award
interest, however, do so on the grounds that an appraisal is some
form of arbitration, and the courts analogize from the principle
that arbitral panels are empowered to award interest.  *See Acme
Roll Forming*, 110 F. Supp. 2d at 569-70; *David A. Brooks Enters.,*
370 N.W.2d at 435; *Waradzin*, 570 A.2d at 650.  Louisiana law, in
contrast, draws a sharp distinction between an appraisal and an
arbitration.  For example, in *Housing Authority of New Orleans v.
Henry Ericsson Co.*, the Louisiana Supreme Court noted that "[i]n
theory, arbitration is a substitute for a proceeding in court,
and should not be confused with what takes place where parties
refer to selected persons some ministerial duty or some matter
involving only the ascertainment of facts, requiring no hearing
nor the exercise of judicial discretion upon the question in
dispute."  2 So. 2d 195, 199 (La. 1941); *see also Prien Props.*,
2008 WL 1733591, at *2, *Fourchon Docks*, 1988 WL 32938, at *6;
*Girard*, 198 So. 2d at 446.

In Louisiana, if prejudgment interest on a damage award is
to be awarded at all, it is typically awarded by courts as part
of an adjudication.  *See, e.g., Arceneaux v. Amstar Corp.*, 969
So. 2d 755, 784-85 (La. Ct. App. 2007); *Cave v. Davison*, No. 99-
1989, 2001 WL 1098058, at *20 (E.D. La. Sept. 18, 2001).  An

appraisal, however, is not an adjudicative proceeding. *See,*
*e.g., Hartford Lloyd's*, 898 F.2d at 1061-62.  If plaintiff is
indeed entitled to interest on any loss, it is for the Court, and
not for the appraisers, to award it.

In addition, the structure of the policy suggests that the
appraisal panel is limited to calculating the direct physical
loss to property or loss of business income.  Courts are bound to
interpret contracts in a manner that takes the entire contract
into account.  LA. CIV. CODE art. 2050.  The appraisal provisions
speak to disagreement about "the value of the property or the
amount of loss."  The term "loss," when used in the same sentence
with "the value of the property," suggests that the appraisers
are tasked with determining the reduction in the value of the
property in question, not the total loss to the insured that
would include the time value of money.  Furthermore, the policy
form that insures buildings and personal property provides
coverage only for "*direct physical loss* of or damaged to Covered
Property . . . caused by or resulting from a Covered Cause of
Loss."  R. Doc. 14, Ex. 1 at 23 (emphasis added).  The business
income form indicates that the insurer will pay for "*actual loss*
of Business Income."  *Id.* at 32 (emphasis added).  "Business
Income" includes net income that would have been incurred without
the casualty, as well as normal operating expenses.  It does not
include interest on the loss.  *Id.*  Both of these forms of

coverage indicate that the term "loss," as used in the policy, is not meant to include interest on top of the insurer's obligation to pay.

Furthermore, the appraisal award is still subject to challenge on grounds of coverage and causation. *Id.* at 27 ("If there is an appraisal, we will still retain our right to deny the claim."). This suggests that the amount listed on the appraisal award was not intended to be the type of final determination of damages upon which a court would add interest. For the same reason, the possibility exists that a court will award less than the full value found by the appraisers after trial. Therefore, not only is inclusion of interest in the appraisal award inconsistent with the apparent mandate of the appraisal panel, it may also complicate a court's post-trial calculation of damages and interest. The Court therefore holds that, in this case, it was improper for the appraisal panel to include interest in its award.

*D. Alleged Errors in the Award*

As an initial matter, it is not clear whether, under Louisiana law, a court may reject an appraisal award contractually specified to be "binding" on the grounds that the appraisal itself contains mere errors. The policy language states that a "decision agreed to by any two *will be binding*."

The appraisal process described in the contract establishes structural safeguards against error, and the language of the contract says nothing about a party's ability to challenge, on the basis of mistake, an award that was produced through the contractually specified procedure.

This was apparently the approach taken by the court in *Prien Properties*. There, the court noted that "the amount of the loss" as reflected in the appraisal award was at issue, and held that "provided that both parties fulfilled the contractual conditions of the Policy, the appraisal award is binding." 2008 WL 1733591, at 2. The court went on to find no violation of the terms of the policy, and did not address the challenge to the amount of the loss.

Other courts have applied the standards for challenges to arbitration awards. In *Musso's Corner, Inc. v. A&R Underwriters, Inc.*, 539 So. 2d 915 (La. Ct. App. 1989), the court considered the appraisal award to be an arbitration award and, upon a challenge that the amounts represented in the appraisal were fraudulent, looked to the criteria that govern challenges to arbitration awards in LA. REV. STAT. § 9:4210. *Musso's Corner*, 539 So. 2d at 918-19; *see also Farber*, 999 So. 2d at 333-34. Those criteria include (1) "[w]here the award was procured by corruption, fraud, or undue means"; (2) "[w]here there was evident partiality or corruption on the part of the arbitrators

or any of them"; (3) "[w]here the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party have been prejudiced"; and (4) "[w]here the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made." LA. REV. STAT. § 9:4210. These criteria focus upon impropriety or misconduct on the arbitrators' behalf, and do not appear to allow a court to interfere with an award on the basis of mistake. The correctness of equating an appraisal with an arbitration, however, is subject to doubt. Again, courts applying Louisiana law have continually made a distinction between the two. *See, e.g., Henry Ericsson Co.*, 2 So. 2d 195 at 199; *see also Prien Props.*, 2008 WL 1733591, at *2, *Fourchon Docks*, 1988 WL 32938, at *6; *Girard*, 198 So. 2d at 446.

The court in *Dawes v. Continental Insurance Company of City of New York*, in response to an argument that an appraisal award set a "ridiculous figure" that "constitutes clear proof of fraud," offered this standard:

> To succeed in this action the plaintiff must show, either that the appraisement was conducted in an improper manner, or that the award was the result of fraud or of gross error amounting to fraud. Mere inadequacy of the amount of the award or a mistake of judgment on the part of the appraisers in arriving at the sum to be allowed would not be sufficient to authorize a court of equity to interfere unless the

23

> inadequacy is so great as to indicate corruption or
> bias on the part of the appraisers.

1 F. Supp. 603, 606 (E.D. La. 1932). Courts in sister states are more explicit than Louisiana courts about the grounds upon which an appraisal may be challenged, and they allow challenges to an appraisal based on mistakes. *See, e.g., JM Walker LLC v. Acadia Ins. Co.*, No. 09-10562, 2009 WL 4884943, at *1 (5th Cir. Dec. 18, 2009) (per curiam) (appraisal awards are binding and presumptively correct under Texas law, and may be disregarded only (1) if made without authority; (2) made as a result of fraud, accident, or mistake; or (3) not in compliance with policy requirements); *Munn v. Nat'l Fire Ins. Co. of Hartford*, 115 So. 2d 54, 58 (Miss. 1959) ("it is elementary law that an appraisal is presumptively correct, but it is also the law that the court may set aside the appraisal where the award is so grossly inadequate or excessive as to amount to a fraud in effect, although fraud is not charged, or where the appraisers were without authority, or where there is a mistake of fact or to prevent injustice").

Although there is some difference of opinion on the matter, this Court takes the view that appraisal awards are presumed correct, and a court should not disrupt an appraisal award simply because reasonable minds could differ as to the amount awarded or the methods employed. A court, however, is not bound to confirm an award that contains clear mistakes of fact.

Defendant points to three alleged errors in the award. First, it claims that the award relies upon an estimate to repair the roof of the hospital that totals over one million dollars. It notes, however, that the supporting documentation reveals an estimate for approximately $840,000. Defendant points to O'Leary's deposition testimony, in which O'Leary stated that the original estimate from the roofing company was $840,000, but that the company later provided a revised estimate that reflected the larger figure. O'Leary Deposition, R. Doc. 83, Ex. 7 at 202-208. He did not have a copy of this later estimate, and defendant argues that it is not to be found in any of the documentation that was exchanged during the appraisal process and subsequent court proceedings.

This assignment of error is insufficient to interfere with the award. Again, "every reasonable intendment and presumption is in favor of an award of appraisers selected to determine the value of property lost." *In re Waters*, 93 F.2d at 200. O'Leary testified to the existence of a revised estimate that was provided to him by the roofing company, and although defendant claims that no documentation exists to confirm this, neither the policy language nor the relevant case law requires that every aspect of the award be supported by physical documentation. Based on the evidence presented, this alleged error is insufficient to reject the award.

Next, defendant contends that plaintiff is not making a claim for extra expense under the policy, but that the appraisal award does in fact contain an award for extra expense. It points to business interruption estimates made by plaintiff's public adjusting firm and notes that these estimates appear to take account of a $167,143.40 award for extra expenses. R. Doc. 83, Ex. 13. It states that, based on this figure, the final award improperly included an award for coverage that plaintiff did not claim.

O'Leary, however, testified in his deposition that he did not accept all of the public adjusting firm's numbers in making his award, and that he changed several of the numbers it provided. O'Leary Deposition, R. Doc. 83 at 93-95. He further testified that he reduced the numbers provided by the public adjusting firm because he believed them to be too high. *Id.* at 126-31. Furthermore, he stated that he had made a note to himself that the award should not include amounts for extra expense and that he did not simply subtract the extra expense award included in the adjusting firm's calculation. *Id.* at 187-88. He subtracted additional amounts as well. *Id.* Carpenter, too, testified that he was aware that extra expense was not claimed by the hospital and that his understanding was that O'Leary had subtracted the extra expense charge to reach his final numbers. Carpenter was asked during his deposition whether

it was correct that O'Leary "took the business income claim amount" from plaintiff's public adjusting firm and "*subtracted the extra expenses of $167,143.40.*" Carpenter responded that this was correct. Carpenter Deposition, R. Doc. 83, Ex. 8 at 79-80 (emphasis added). In addition, the final award unambiguously indicates that business income award does not include extra expense. R. Doc. 83, Ex. 6 (listing award as "Business Income (without EE)").

In short, to the extent that any error was made as to the inclusion of extra expense, it appears to have been made by the public adjuster in the initial calculation and did not make it into the final award. Defendant has not demonstrated the kind of clear error that would justify rejection of the award.

Finally, defendant contends that the appraisal award improperly double-counted certain items. It asserts that O'Leary's estimate lists the damage to the main structures in the hospital complex as $1,541,394.44, and that this figure includes damage to fencing (in the amount of $11,885.25), storage sheds (in the amount of $2,242.50), and the annex building (in the amount of $55,136.12). R. Doc. 83, Ex. 1 at Tab 1. The appraisal award, however, allegedly uses the $1,541,394.44 figure as damage to the main building, but makes separate awards for fencing, storage sheds, and the annex building in the exact amounts as was included for these categories in O'Leary's

original estimate.  Defendant argues that this figure counts the damage to these three categories twice.

Carpenter, in his deposition testimony, agreed that this constituted accidental double-counting and that the "duplication" of the award for these three categories was an error in the appraisal.  Carpenter Deposition, R. Doc. 83, Ex. 8 at 69-72, 89-90.  The Court finds that this is the type of calculation that contains a clear error of fact and cannot stand.

To the extent that defendant makes additional arguments about errors in the calculation of business income, the Court is at a loss to understand what they are.


E. *Appraisers' Duty to List the Value of the Property and the Amount of the Loss Separately*

Defendant next argues that the appraisers failed to list the value of the property and the amount of the loss separately. Again, the policy form for business and personal property coverage states that "[t]he appraisers will state separately the value of the property and the amount of the loss."  R. Doc. 14, Ex. A at 27.  Defendant claims that neither the appraisers nor the umpire in his final award properly separated these damages, and the award is unenforceable for this reason.

Defendant points to the 1941 case of *Branch v. Springfield Fire & Marine Insurance Company of Springfield, Massachusetts*, in which the Louisiana Supreme Court faced an appraisal provision

that was similar to the one at issue here in that it required the appraisers to "stat[e] separately sound value and damage." 4 So. 2d at 808. After the insurance company unsuccessfully urged the court below to accept the award, the Supreme Court found that "the appraisers failed and neglected to ascertain the sound value of the plaintiff's building in the appraisement of the loss, [and] the award is null for that reason alone." *Id.* at 809. The court reasoned that no award would be valid unless the appraisers complied with the contractual language, which, because it is "somewhat in derogation of [the insured's] right to have his dispute determined by the courts," should be strictly construed. *Id.* When "the policy makes it mandatory for the appraisers to determine the sound value of the insured property, their failure to do so cannot be regarded as harmless." *Id.* ("The established jurisprudence of this country is that the failure of the appraisers to fix the sound value, where the policy requires it to be fixed, renders the award unenforcible [sic].").

Plaintiff contends that *Branch* does not require strict adherence to the contractual language. It contends that a contract must be construed against the party that furnished its text, *see* LA. CIV. CODE art. 2056, and that the *Branch* court simply applied this principle to find that a strict construction of the contract benefitted the insured, who did not supply the contract's text. It is not pellucid that the Louisiana Supreme

29

Court would have insisted on strict construction if the insurer, not the insured, was seeking to invalidate an appraisal for noncompliance with every provision of the appraisal clause. On the one hand, *Branch* at no point states that it is invoking the principle of interpreting contracts against the drafter. On the other hand, the opinion does state that strict construction is necessary because "[p]olicy provisions requiring *the insured* to submit the amount of his loss to private appraisal, although valid, are somewhat in derogation of his right to have his dispute determined by the courts . . . ." 4 So. 2d at 809 (emphasis added). The Louisiana Supreme Court may have reasoned that the insurer wrote the policy to include the appraisal language, so it had to live with the requirements it imposed.

Based on the full reasoning of *Branch* and later case law, this Court does not read the language of *Branch* as mandating strict construction of the appraisal clause when the insurer relies on it, but not when the insured does so. At several other points in the opinion, the *Branch* court analyzes the appraisers' adherence to the contractual language without mention of who invokes the provision. *See id.* ("in order for the award of the appraisers to be binding, it must clearly appear that they have performed the duties required of them by the policy, which is the law between the contracting parties"). Furthermore, later courts that have articulated the holding of *Branch* do not indicate that

the rule should change depending on which party insists on strict adherence to the appraisal requirements. *See Girard*, 198 So. 2d at 446-47 ("Thus, the [Louisiana] Supreme Court has specifically held such stipulations for an appraisal are valid, but that the estimation is not binding on the parties in the event the appraisers and umpire fail to discharge their duty of ascertaining the 'actual cash value and loss.'"); *see also Fourchon Docks*, 1988 WL 32938, at *2, 8 (reciting strict construction rule even though plaintiff invoked the appraisal provision). Accordingly, if the appraisers here did not list the damages in accordance with the contractual provisions, the award cannot be enforced.

One court appears to extend this requirement to the umpire in the final award as well, despite an absence of contractual language requiring it. *See Fourchon Docks*, 1988 WL 32938, at *8 (quoting *Girard*, 198 So. 2d at 447). Such an extension is not allowed by the strict construction mandated by *Branch*. *See Branch*, 2 So. 2d at 809. The policy language here requires only that the appraisers separate these statements, and the Court will not extend this requirement to the umpire.

Here, the appraisal provision in the business and personal property form obligated the appraisers to state the "value of the property and amount of the loss." The parties agree that "value of the property" refers to the actual cash value of the property

at the time of the loss, and that this can be measured as replacement cost less depreciation. O'Leary's submissions, specifically a report assembled by the private adjustor Balance Loss Consultants, is a replacement-cost estimate that contains no reduction for depreciation. Hence, it does not contain a separate assessment of the "value of the property," as required by the policy. *See* R. Doc. 83, Ex. 1.

Provencher's appraisal report does not appear to contain such a valuation, either. Although the copy provided to the Court is difficult to decipher, it appears as if his appraisal took the form of a report from BELFOR Property Restoration Company. R. Doc. 83, Ex. 2 at Tab 7. This report gives a replacement-cost estimate of $253,416.96 for repairs to the property, and includes an itemized listing of costs for materials and labor. It does not separately show the actual cash value as depreciated replacement cost or otherwise. It therefore does not comply with the contractual language that requires a separate listing of property value and loss, and it, too, runs afoul of *Branch*.

Both appraisers, however, appear to have complied with their contractual obligations with respect to the business income form. That form specifies that "[t]he appraisers will state separately the amount of Net Income and operating expense or amount of

loss."[4]  R. Doc. 14, Ex. A at 33.  "Net Income" is defined as

"Net Profit or Loss before income taxes."  *Id.* at 32.  O'Leary's

report contains a document supplied by an outside firm that lists

the net income of the Hospital for the months of September 2004

and September 2005, as well as the calculation for the Hospital's

total loss of business income.  R. Doc. 83, Ex. 1 at Tab 9.

Another document produced and exchanged by plaintiff in the

course of the appraisal discussions listed the Hospital's net

income and operating expenses broken down by months.  R. Doc. 83.

Ex. 4, 5.  Provencher, too, submitted calculations of Net Income

and operating expenses for numerous time periods, as well as an

assessment of total loss of business income, which he found to be

zero.  R. Doc. 83, Ex. 2 at Tabs 9-11.  These documents satisfy

the contractual obligations under the business income form.

Accordingly, although the appraisers complied with the

contractual provisions regarding business income, neither

appraiser complied with the policy requirement to "state

separately the value of the property and the amount of the loss."

This error renders the appraisal award in its current form

---

[4] The Court notes that there are at least two possible
interpretations of this language.  In the first, the provision is
satisfied if the appraisers list both Net Income and operating
expense, or, alternatively, solely the amount of loss.  In the
second, the appraisers must list Net Income, and they also must
list either operating expense or the amount of loss, but not
necessarily both.  The Court need not resolve this quandary
because both appraisers satisfied both interpretations during the
course of the appraisal.

unenforceable under *Branch*.

*F. Remedy*

Defendant asserts that the perceived errors require the Court to vacate the award entirely. The Court has found three infirmities with the award: the inclusion of interest, the failure of the appraisers to list damages and property value in accordance with the policy language, and the alleged $69,263.87 double counting that Carpenter acknowledged was an error. The failure to list the damages and value properly by itself renders the award in its current form unenforceable. This, however, does not necessarily mean that the Court must ignore the award and proceed to trial, during which a jury will determine the amount of the loss.

The plain language of the policy sets forth a procedure for appraisal of contested loss and makes clear that a properly conducted award "will be binding." Defendant, who supplied the text of the policy, specifically included this provision, and the Court cannot ignore that it is an element of the legally binding contract.

Again, the purpose of the appraisal procedure is to obviate the need for the factfinder in a court proceeding to determine the value of the property in question. Such policy provisions allow the parties to determine the value without the expense and

technicality of judicial proceedings.  *Penn. Lumbermens*, 138 F.2d at 366; *Hartford Lloyd's*, 898 F.2d 1058, 1061-62.  Unlike the Court or a jury, the appraisers are amply familiar with the intricacies of the award and the facts underlying it, and defendant has not justified any challenges to the bulk of the award.  Furthermore, the errors in the award require three discrete and straightforward corrections that can be made by simple mathematical calculations.  The appraisal panel does not need to review or reevaluate the vast majority of the determinations underlying the award.  With this in mind, the Court does not see why the appraisers cannot correct the identified errors themselves.

The Fifth Circuit's reasoning in the case of *Mitchell v. AETNA Cas. & Surety Co.*, 579 F.2d 342 (5th Cir. 1978) (Wisdom, J.), is instructive.  The court there, analyzing Mississippi law, found a "general rule that the appraisers, rather than the trial judge or jury, should correct errors [in an appraisal award] that the judge or jury may find to exist.  This approach would be inappropriate *only when* an appraisal is vacated for fraud or another reason casting doubt on the basic competency of the appraisers."  *Id.* at 352 (emphasis added).  As discussed above, the Court has already ruled on the competency and impartiality of the appraisers.

Although the case here arises under Louisiana and not

Mississippi law, the Court is aware of no reason why the principle announced in *Mitchell* cannot be applied to this dispute. The parties have provided no authorities that would indicate that remand to the appraisers is contrary to Louisiana law, and the Court is aware of none. Furthermore, in addition to the practical advantages identified by the Fifth Circuit in *Mitchell*, such an approach is faithful to the intent of the parties as reflected in the plain language of the insurance policy. LA. CIV. CODE ANN. art. 2045-46. Such an approach is also consistent with the use of contractually obligatory appraisal provisions as a more expedient and efficient alternative to court proceedings. *Penn. Lumbermens*, 138 F.2d at 366.

Finally, remand to the appraisal panel is the most appropriate remedy when the appraisers fail to list property value and loss separately as required by *Branch*. The strict construction required by *Branch* would appear to allow a party to vacate an appraisal award even though *its own appraiser* failed to comply with the contractual provisions. Thus, a party who resists the appraisal process could simply instruct its appraiser not to list sound value and loss separately, which would prove fatal to the award. In this case, for example, defendant argues that the appraisal award must be vacated because the appraisers failed to list property value and loss separately. Defendant's appraiser, however, committed this error as well, and there is no

36

indication from the record that defendant took any steps to ensure that its own appraiser complied with the contractual language. Allowing a party to circumvent the binding appraisal process because of the conduct of its own appraiser is an anomalous result, and one that could be avoided by remanding the award instead of vacating it. For all these reasons, the Court finds that "a remand to the appraisers is the most reasonable approach" in this case. *Mitchell*, 579 F.2d at 352.

## III. Conclusion

For the foregoing reasons, the Court will neither confirm nor vacate the appraisal award. Accordingly, both motions are DENIED, and the matter of appraisal is REMANDED to the appraisal panel to (1) subtract all interest from the final award; (2) include a separate calculation of "the value of the property"; and (3) resolve the double-counting errors analyzed above in a manner understood and agreed to by at least two of the three panel members.

New Orleans, Louisiana, this ___13th___ day of January, 2010.

_Sarah Vance_
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE